IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
---

MONICA KENEALY,

                Plaintiff,

v.                                              OPINION and ORDER

ANDREW SAUL,                                    19-cv-40-jdp
Commissioner of the Social Security Administration,

                Defendant.
---

Plaintiff Monica Kenealy seeks judicial review of a final decision of defendant Andrew Saul, Commissioner of the Social Security Administration, finding her not disabled under the Social Security Act. She contends that administrative law judge (ALJ) Michael Schaefer erred by (1) giving more weight to a non-examining consultant than to two consultants who examined her; (2) inadequately accounting for Kenealy's fatigue; and (3) relying on inadequately supported testimony from a vocational expert. None of these issues require remand, so the court will affirm the commissioner's decision.

ANALYSIS

Kenealy's application for disability benefits has a long history, which the court summarizes only briefly. She filed her initial application in August 2010, alleging that she was disabled as of August 27, 2010, by multiple sclerosis and depression. After ALJ Brenton L. Rogozen denied her claim, the agency Appeals Council remanded her case to ALJ Rogozen for reconsideration. ALJ Rogozen held a second hearing and again denied Kenealy's claim. After the Appeals Council denied review of the ALJ's second decision, Kenealy appealed to this court.

While Kenealy's appeal to this court was pending, she filed a second application for disability benefits in November 2013, alleging disability as of August 25, 2010, again due to multiple sclerosis and depression. After a hearing, ALJ Schaefer denied Kenealy's second claim.

After ALJ Schaefer's denial of Kenealy's second claim, this court remanded her first claim for reconsideration. *Kenealy v. Berryhill*, No. 15-cv-85, 2017 WL 527889 (W.D. Wis. Feb. 9, 2017). The Appeals Council then directed ALJ Schaefer to reconsider Kenealy's first claim, dismissing her second claim as redundant.

This brings us to the decision now before the court, which concerns the question of whether Kenealy has been disabled since August 27, 2010. ALJ Schaefer held a new hearing, after which he determined that Kenealy suffered from one severe impairment (multiple sclerosis) and one non-severe impairment (depression). R. 458.[1] He concluded that she had the residual functional capacity (RFC) to perform sedentary work with no more than frequent handling and fingering. R. 461. He also determined that due to her mild depression and physical symptoms, including fatigue from her multiple sclerosis, she was "limited to understanding, remembering, and carrying out simple instructions and routine repetitive tasks." *Id.* The RFC also included many other restrictions not relevant to this appeal. The ALJ found that Kenealy wasn't disabled because she could work as a telephone solicitor, an order clerk, or a cashier, positions that he determined were sufficiently available in the national economy. R. 467.

This court must uphold the commissioner's decision to deny benefits "if it applies the correct legal standard and is supported by substantial evidence." *Campbell v. Astrue*, 627 F.3d

---

[1] Record cites are to the administrative transcript, located at Dkt. 7.

299, 306 (7th Cir. 2010). The "substantial evidence" standard is deferential, requiring only that the ALJ base his decision on relevant evidence that a reasonable person could find sufficient to support the decision. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). In other words, the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" to deny benefits. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

**A. Handling and fingering restrictions**

In determining that Kenealy could engage in frequent handling and fingering, the ALJ considered opinions from three consultants: Hongjing Tan, who examined Kenealy and restricted her to occasional fingering without any restrictions on handling, R. 375; Krissi Danielsson, who examined Kenealy and restricted her to occasional fingering and handling, R. 1354; and George Walcott, who didn't examine Kenealy and concluded that she couldn't engage in continuous forceful gripping and grasping, R. 626.[2] The ALJ gave no weight to Tan's restriction and little weight to Danielsson's, but he gave great weight to Walcott's, which he found consistent with a restriction to frequent handling and fingering, R. 465.

Kenealy contends that the ALJ should have given more weight to Tan and Danielsson's restrictions than to Walcott's because Tan and Danielsson examined Kenealy and Walcott did not. But federal regulations state that the ALJ will "generally" give more weight to the opinions of examining sources than to non-examining ones. 20 C.F.R. § 404.1527(c)(1). An ALJ must support the decision to credit a non-examining source's opinion over an examining source's

---

[2] Kenealy says that Tan and Danielsson both restricted her to occasional handling and fingering, R. 11, at 11, but this isn't the case, as Tan didn't restrict Kenealy's handling in any way. But the commissioner doesn't address this discrepancy in his brief, and it doesn't affect the ALJ's reasons for discounting Tan's fingering restriction.

3

opinion with substantial evidence in the record. *Gudgel*, 345 F.3d at 470. The ALJ has done so here.

   1. **Tan's fingering restriction**

The ALJ gave Tan's fingering restriction no weight because Tan cited no objective evidence to support it and because it was inconsistent with evidence regarding Kenealy's work history. R. 464. Kenealy challenges the ALJ's rejection of Tan's restriction on two grounds, contending that (1) Tan's restriction was adequately supported by objective evidence elsewhere in his opinion; and (2) the ALJ incorrectly inferred that Kenealy could engage in frequent handling and fingering from her work history.

First, Kenealy says that Tan's full report shows adequate support for his fingering restriction. But an ALJ can discount an opinion that isn't supported with objective evidence, *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005), and the only objective evidence Tan offered to support his fingering restriction was the vague statement that Kenealy's "MRI suggested MS," R. 375. Kenealy says that the rest of Tan's report shows objective support for his fingering restriction, but she identifies only one objective finding regarding Kenealy's hands: Tan's observation that her "[r]apid hand movement was a little slow bilaterally," R. 372. Neither Tan nor Kenealy explains why slightly slow rapid hand movement would support a restriction to occasional handling and fingering, and Kenealy identifies no other objective findings or evidence in her record that would support Tan's restrictions.

Second, Kenealy says that the ALJ erred when he inferred that she could engage in frequent handling and fingering from her work history. The ALJ noted that between late 2016 and late 2017, Kenealy simultaneously worked as a cashier and a secretary "at significant levels of earnings and for significant time," R. 464, "at a full time, or substantial part time basis,"

4

R. 466. He also noted that the Dictionary of Occupational Titles classified both jobs as requiring frequent handling and fingering. R. 458.

Kenealy says that she testified that she only worked 20 hours per week during this period, which wouldn't support the ALJ's inference that she could perform frequent handling and fingering on a fulltime basis. But the testimony she cites, R. 499, concerns a later job that she started at the end of 2017, not the jobs she worked during the period at issue. And although she was only supposed to work 20 hours per week at her 2016–17 secretarial job, she testified that she worked "a lot more" than that, including periods in which she worked up to five days in a row from 9:00 to 6:00. R. 502–503. She also worked additional hours as a grocery store cashier at the same time. R. 792–93. So this testimony doesn't undercut the ALJ's assessment of her work history, and Kenealy doesn't challenge it on any other grounds.

2. **Danielsson's handling and fingering restrictions**

The ALJ gave Danielsson's handling and fingering restrictions little weight, finding her opinion overly reliant on Kenealy's reports of subjective symptoms and, like Tan's, inconsistent with Kenealy's work history. R. 465–66. The ALJ's findings regarding Kenealy's work history are supported by the evidence, as discussed above. Kenealy raises two challenges to the ALJ's criticism that Danielsson relied too heavily on Kenealy's symptom reports: (1) the ALJ mistakenly assumed that Danielsson lacked access to Kenealy's medical records, and (2) the ALJ erred in discounting Kenealy's symptom reports because he evaluated them under a standard that was unsupported by medical evidence or authority.

First, Kenealy challenges the ALJ's statement that "Danielsson had little access to the medical evidence of record," R. 466. The commissioner concedes that this was an error by the ALJ. Dkt. 15, at 17. But he notes that Danielsson's description of Kenealy's medical history

relies heavily on Kenealy's symptom reports and that Danielsson never mentions Kenealy's medical records. *Id.* Kenealy doesn't address this point in her reply brief, nor does she identify any objective evidence in her medical record that would support Danielsson's restrictions. Without any such evidence, the court is confident that the ALJ would come to the same decision on remand, so the error is harmless. *Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015).

Second, Kenealy contends that the ALJ shouldn't have faulted Danielsson's opinion for relying on Kenealy's reports of constant subjective symptoms, which the ALJ discounted. She says that the ALJ erred by assessing her symptom reports under an unsupported standard. In evaluating the credibility of Kenealy's symptom reports, the ALJ noted that they weren't supported by "lasting objectively verified neurological symptoms" in her medical record. R. 463. Kenealy accuses the ALJ of "playing doctor" here by substituting his own medical judgment for Danielsson's. She says that the ALJ's assessment of her symptom reports applied a standard that wasn't supported by medical evidence or authority: a requirement that reports of constant subjective symptoms must be supported by lasting, objectively verified neurological symptoms.

But the statement that Kenealy challenges regarding her lack of lasting symptoms isn't a standard that the ALJ applied—it is his summary of his overall evaluation of Kenealy's medical record, R. 462–63, which showed that her multiple sclerosis "had been under reasonable control with medication," R. 463. He found Kenealy's symptom reports to be inconsistent with her activities of daily living, with clinical findings regarding her hand and lower extremity strength, and with the minimal treatment she received for her hand and feet symptoms. *Id.* He noted that multiple sclerosis is a progressive disorder and concluded that her

symptoms hadn't progressed far enough to prevent her from performing sedentary work with restrictions. *Id.*

This assessment of Kenealy's symptom reports is supported by the conclusions reached by Walcott, the agency's non-examining consultant, following his review of Kenealy's medical record. Walcott determined that Kenealy's reports of constant symptoms were inconsistent with her record, which demonstrated relapsing and remitting multiple sclerosis rather than a consistently disabling disease. R. 625. The ALJ's evaluation of Kenealy's credibility was supported by substantial evidence—her activities of daily living, her clinical findings, her treatment history, and Walcott's opinion—so the ALJ was justified in discounting Danielsson's opinion for relying on Kenealy's reports of subjective symptoms.

In sum, the ALJ discounted both Tan and Danielsson's opinions because they weren't supported by objective evidence and they weren't consistent with Kenealy's medical record and work history. The ALJ found, in contrast, that Walcott's opinion matched Kenealy's symptoms and that Walcott's proposed restrictions were consistent with Kenealy's medical record and work history. R. 464–65. The ALJ's decision to give less weight to Tan and Danielsson's restrictions than to Walcott's was supported by substantial evidence and adequately explained.

## B. Fatigue

Kenealy contends that the ALJ erred in failing to credit her treating physician's opinion that she has experienced fatigue and in discounting her own complaints about fatigue. But the ALJ adequately handled these issues, too.

### 1. Treating physician's opinion

In determining Kenealy's RFC, the ALJ considered a letter from Christopher Bixler, Kenealy's treating physician. Bixler wrote that Kenealy

7

> has experienced fatigue as part of her condition which is very common in multiple sclerosis. Fatigue is subjective and difficult to quantify. Some people with fatigue continue to work; many people with multiple sclerosis that have significant fatigue limit their work hours and work part-time because of the fatigue associated with a full workday. She had new objective weakness in her left upper and left lower extremity in April 2011, and she was treated with intravenous steroids after that relapse.

R. 366. In considering this statement, the ALJ observed that Bixler did little more than confirm her multiple sclerosis diagnosis and "note[] generic symptoms or effects arising from the condition." R. 464. He gave Bixler's letter little weight in determining Kenealy's RFC because it didn't describe any functional abilities or limitations specific to Kenealy. *Id.*

Kenealy says that Bixler's statement regarding her fatigue should have received controlling weight under 20 C.F.R. § 404.1527(c)(2), a regulation that was in effect when Kenealy filed her claim. That regulation states that a treating physician's opinion on "the nature and severity of [the claimant's] impairment(s)" should receive controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and otherwise consistent with the evidence in the record. *Id.*; *see also Moss v. Astrue*, 555 F.3d 556, 560–61 (7th Cir. 2009). Kenealy also says that if the ALJ didn't give Bixler's statement controlling weight, he should have applied several regulatory factors to determine how much weight to give it. *See* 20 C.F.R. §§ 404.1527(c)(2)–(6).

But the regulation Kenealy cites doesn't apply to every statement that comes from a doctor; it applies only to medical *opinions*, which it defines as statements from medical sources "that reflect judgments about the nature and severity of [a claimant's] impairment(s)." 20 C.F.R. 404.1527(a)(1). Bixler's statement isn't an opinion under this definition. He merely observes that Kenealy has experienced fatigue, a symptom that he warns is "subjective and difficult to quantify." R. 366. He says nothing about the nature or severity of Kenealy's fatigue,

8

only discussing fatigue in general terms. And he doesn't indicate how fatigue might specifically limit Kenealy. In short, there's nothing to give controlling weight *to* in Bixler's statement, so the ALJ didn't err in declining to give it controlling weight and in assigning it little weight without considering it under § 404.1527's factors.

2. **Kenealy's complaints**

The ALJ discounted Kenealy's complaints of fatigue, which consisted of her written submissions and hearing testimony that her fatigue prevented her from fulltime work and limited her daily activities such as cooking and chores. R. 117; R. 149–50; R. 226–30. She said that she had to go home to rest after each work shift and that she couldn't work more than three consecutive days. R. 515–16. But the ALJ discounted Kenealy's complaints of fatigue because she generally didn't discuss those complaints with her treatment providers. R. 463. He also noted that a medical examiner, Dr. Woodrow Janese, testified in Kenealy's 2013 hearing that her medical record contained no evidence of fatigue. R. 462.

Kenealy says the ALJ should have accounted for her complaints of fatigue in determining her RFC. But she doesn't address the ALJ's reasons for discounting those complaints—that she didn't discuss them with her providers and that they weren't otherwise documented in her medical record. She doesn't identify any occasions when she did discuss fatigue with her providers or pointing to any medical record evidence of fatigue. Instead, she cites her testimony and written submissions, which are irrelevant to the ALJ's reasons. She cites medical-record evidence about her pain, which says nothing about her fatigue. And she cites online medical information stating that fatigue is a common symptom of multiple sclerosis, which says nothing about Kenealy's own experience of fatigue. None of this information is relevant to the ALJ's reasons for discounting Kenealy's complaints of fatigue.

9

## C. Vocational expert testimony

If a claimant is unable to work in her previous occupations, the commissioner bears the burden of showing that the claimant can work in another occupation that "exists in significant numbers in the national economy." 20 C.F.R. § 404.1560(c)(2). In determining that such occupations were available to Kenealy, the ALJ relied on the testimony of a vocational expert. Kenealy challenges that testimony on two grounds, contending that (1) the ALJ failed to explain a conflict between the expert's testimony and the Dictionary of Occupational Titles; and (2) the expert's job-number estimates weren't calculated by a reliable method.

### 1. Conflict with the Dictionary of Occupational Titles

The vocational expert testified that a person with Kenealy's restrictions could work in the job titles of "telephone solicitor," "order clerk," or "cashier." R. 524–25. She said that the Dictionary of Occupational Titles classified "telephone solicitor" as a semiskilled, sedentary job, "order clerk" as a semiskilled, sedentary job, and "cashier" as an unskilled, light job. *Id.* She estimated that nationally, approximately 40,000 telephone solicitor jobs, 8,000 order clerk jobs, and 100,000 cashier jobs would satisfy Kenealy's specific requirements, including her restriction to routine work. *Id.*

When questioning the vocational expert, Kenealy's attorney noted that the Dictionary classifies these jobs at Reasoning Development level three, which requires the worker to "[d]eal with problems involving several concrete variables in or from standardized situations," *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (quoting Department of Labor, Dictionary of Occupational Titles app. C(III)). He asked the expert whether such jobs were inconsistent with a restriction to routine work. R. 537. She explained her view that a job's Reasoning

Development level wasn't the only factor that determined whether a job was simple, routine, or repetitive. *Id.*

Kenealy's attorney asked the expert what her disagreement with the Dictionary was based on, to which she replied, "Talking with employers over my years of experience as a vocational rehabilitation counselor, working with individuals who do these jobs, education and training as a rehabilitation counselor." R. 537–38. She said she had specifically discussed the reasoning required to work as a telephone solicitor only one month before Kenealy's hearing. R. 538. She said that she used her experience to estimate how many positions in these job titles were performed at the unskilled level. R. 539. In his decision, the ALJ concluded that the expert's testimony conflicted with the Dictionary on this point but found her testimony to be persuasive because it was "based on her considerable training and experience." R. 468.

Kenealy says that the ALJ didn't attempt to resolve the conflict between the expert's testimony and the Dictionary. She cites authority stating that if a vocational expert's testimony appears to conflict with the Dictionary, an ALJ must obtain a reasonable explanation from the expert for the conflict. *See, e.g.*, SSR 00-4p, 2000 WL 1898704, at *1 (Dec. 4, 2000); *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008). But the ALJ obtained a reasonable explanation from the expert. He didn't need to question the expert on her disagreement with the Dictionary because Kenealy's attorney elicited the basis for that disagreement—the expert's education and experience as a vocational counselor, including her experience placing people into the jobs at issue. R. 536–38. The expert also submitted her resume, which Kenealy didn't object to, and which showed that she had been working as a vocational expert and counselor for over a decade at the time of Kenealy's hearing. R. 874–76. The expert provided the ALJ with a reasonable

explanation for her disagreement with the Dictionary, so the ALJ was justified in relying on the expert's testimony on this point.

### 2. Job estimates

Kenealy also challenges the job-number estimates that the vocational expert provided for the three job titles she identified. A vocational expert's job-number estimates must be "the product of a reliable method." *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018). This isn't an exacting standard, as it's impossible to avoid some amount of uncertainty in developing such estimates. *Id.* An expert can support her estimates by "drawing on knowledge of labor market conditions and occupational trends, gleaned from reviewing relevant data sources or from placing workers in jobs." *Id.* at 970.

In the hearing, the expert explained how she arrived at her job-number estimates. R. 524–27. She began by cross-referencing the Dictionary job titles with job numbers compiled by the Department of Labor and Bureau of Labor Statistics. But these job numbers only give total jobs for Dictionary categories, not for individual job titles within those categories. So she considered job-number data from JobBrowser Pro, a computer program that estimates how many positions in a particular job title are available in a particular geographical area, *see Chavez*, 895 F.3d at 966–67. She then adjusted these numbers based on her experience as a vocational rehabilitation counselor in talking to employers and in placing workers into these positions. This is precisely the type of support that *Chavez* describes as sufficient, and the ALJ was justified in relying on the expert's job-number estimates.

### D. Conclusion

The ALJ didn't err in assigning weight to Tan and Danielsson's proposed restrictions or in considering Kenealy's evidence of fatigue, and he was justified in relying on the vocational

expert's testimony. The court will deny Kenealy's motion for summary judgment and affirm the commissioner's decision.

ORDER

IT IS ORDERED that Monica Kenealy's motion for summary judgment, Dkt. 10, is DENIED, and the administrative decision is AFFIRMED. The clerk of court is directed to enter judgment in favor of the defendant and close this case.

Entered December 2, 2019.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge